UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GULF FISHERMEN'S ASSOCIATION, *et al.*, | CIVIL ACTION NO. 2:16-cv-1271-JTM-KWR |
| *Plaintiffs,* | Section: "H" (4) |
| v. | Honorable Jane Triche Milazzo |
| NATIONAL MARINE FISHERIES SERVICE, *et al.*, | Magistrate Karen Wells Roby |
| *Defendants.* | |

## PLAINTIFFS' STATEMENT OF UNCONTESTED MATERIAL FACTS

1.  On January 13, 2016, Defendant National Marine Fisheries Service (NMFS) finalized regulations (Regulations) that authorize a commercial aquaculture permitting scheme in federal waters. The Regulations codify ten actions analyzed in the Fishery Management Plan (FMP) for Regulating Offshore Aquaculture in the Gulf of Mexico, which also constitutes a programmatic Environmental Impact Statement (PEIS) (collectively FMP/PEIS).

2.  Plaintiffs Gulf Fishermen's Association; Gulf Restoration Network; Destin Charter Boat Association; Alabama Charter Fishing Association; Fish for America USA, Inc.; Florida Wildlife Federation; Recirculating Farms Coalition; Food & Water Watch, Inc.; and Center for Food Safety (collectively Plaintiffs) challenge the Regulations and the FMP/PEIS, under the Magnuson-Stevens Fishery Conservation and Management Act (MSA), 16 U.S.C. §§ 1801-1891(d); the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544; the National

Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h; and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

3. Plaintiffs' members include fishermen and local residents whose economic, aesthetic, and personal interests in the Gulf's marine resources, including federally protected species, are injured, and will continue to be injured, by NMFS's offshore aquaculture permitting scheme. *See* Lovera Decl.; Kimbrell Decl.; Fuller Decl.; Brooks Decl.; Sarthou Decl.; Shepard Decl.; Barcilon Decl.; Scott Decl.; Findley Decl.; Daynes Decl.; Favre Decl.; Burke Decl.; Cufone Decl. (filed concurrently). Also, Plaintiffs' interest in timely review of the Regulations and the FMP/PEIS was injured by NMFS's MSA procedural violations. *See* Lovera Decl.; Sarthou Decl. (filed concurrently).

4. As early as 2003, NMFS began working with the Gulf of Mexico Fishery Management Council (Gulf Council) to develop offshore aquaculture through a proposed general amendment to the existing FMPs of wild fisheries, while Congress was attempting to pass national legislation that would authorize aquaculture in federal waters. *See* AR126; AR22912.

5. Under the proposed permit scheme, NMFS treats aquaculture—the farming and rearing of fish in confined structures —as synonymous with the commercial and recreational catching of wild fish.

6. The Regulations defined "aquaculture" as "all activities, including the operation of an aquaculture facility, involved in the propagation or rearing, or attempted propagation or rearing, of allowable aquaculture species in the Gulf EEZ." AR33138.

7. NMFS has authority under the MSA over "fishing," and the MSA defines "fishing" as "(A) the catching, taking, or harvesting of fish; (B) the attempted catching, taking, or harvesting of fish; (C) any other activity which can reasonably be expected to result in the

catching, taking, or harvesting of fish; or (D) any operations at sea in support of, or in preparation for, any activity described [above]." 16 U.S.C. § 1802(16). The MSA does not define "harvesting." So, NMFS went to a dictionary definition, and found a potential definition that includes "the act or process of harvesting a crop." AR0009. Then, using a second, different dictionary, NMFS found a potential definition of "crop" that includes "the yield of some other farm produce." *Id.*

8. When the national legislation did not pass, NMFS turned the proposed general amendment into a stand-alone FMP, so that it could treat all farmed fish, regardless of species, as one "fishery unit" under the MSA. See FR_PR14713; FR_PR11878.

9. Recently, members of Congress have reaffirmed that the MSA does not provide NMFS the authority to start a new aquaculture industry. AR23341; AR190; AR27168; AR26143-26146.

10. In January 2009, the Gulf Council approved a draft of the FMP/PEIS and Regulations. NMFS only sought public input on the draft FMP/PEIS. *See* AR22523; AR23334-35; AR23336-37. The majority of comments opposed offshore aquaculture development. AR19780-795; 23349-6104.

11. On September 3, 2009, NMFS let the FMP/PEIS enter into effect by operation of law (as opposed to affirmatively approving it), citing the lack of a "national [aquaculture] policy." *See* AR33108; AR26197-99.

12. The FMP/PEIS included the following in its purpose and need section, expressly stating its purpose as economic allocation:

> While current regulations authorize NOAA Fisheries Service to grant [exempted fishing permits] for aquaculture in federal waters, such permits are of limited duration and are *not intended for the large-scale production of fish*. As a result, commercial aquaculture in federal waters is not viable under the current

3

permitting process. *A FMP must therefore be developed to authorize the development of commercial aquaculture operations….*

AR22557 (emphases added).

13. The FMP/PEIS proposed, and the Regulations codified, ten actions:

   a. **Gulf aquaculture permit.** Action 1 established the commercial permitting scheme for conducting commercial aquaculture in Gulf waters, AR22537, created a Gulf Aquaculture Permit, and authorized NOAA Fisheries' Southeast Region Regional Administrator to review and approve individual applications. *See id.*; 50 C.F.R. § 622.101 (AR33139-42).

   b. **Permit application requirements.** Action 2 discussed the application process. *See* AR22538-39; 50 C.F.R. § 622.101 (AR33139-42).

   c. **Permit duration.** Action 3 set an initial 10-year permit term, with renewals for 5-year terms thereafter. The renewals are administrative; no additional substantive review is required. AR22539-40; 50 C.F.R. § 622.101(d)(4),(6) (AR33141).

   d. **Aquaculture species.** Action 4 regulated all farmed fish—regardless of species—under the Aquaculture Fishery Management Unit. It authorized the farming of all federally managed fish species besides corals and shrimp. *See* AR22540; 50 C.F.R. § 622.105(b) (AR33144).

   e. **Aquaculture systems**. Action 5 deferred approval of aquaculture structures to the individual application phase, with no minimum requirements. Consideration of a structure's potential threats to essential

        fish habitat, federally protected species, and the marine ecosystem is discretionary. *See* AR22540-41; 50 C.F.R. § 622.105(a) (AR33144).

f. **Siting of aquaculture systems.** Action 6 allowed aquaculture operations in traditional fishing grounds and critical habitats for federally listed species. *See* AR22541; 50 C.F.R. § 622.103 (AR33143). Aquaculture is only prohibited in "Gulf EEZ marine protected areas, marine reserves, habitat areas of particular concern (HAPCs), Special Management Zones, permitted artificial reef areas, and coral areas specified in 50 CFR part 622." AR33111.

g. **Restricted access zones**. Action 7 prohibited fishing and fishing vessels in areas surrounding aquaculture facilities. *See* AR22542; 50 C.F.R. § 622.104 (AR33143).

h. **Recordkeeping and monitoring**. Action 8 established record and self-reporting requirements, instituting after-the-fact reporting of entanglements with marine species (including those protected under the ESA), disease or pathogen findings, and incidents of only "major" fish escapes. AR22542-43; 50 C.F.R. § 622.102 (AR33142-43).

i. **Production capacity**. Action 9 capped annual total aquaculture production at 64 million pounds, and annual production for each operator at 20 percent of the total (OY), or 12.8 million pounds of farmed fish. AR22543-44; 50 C.F.R. § 622.107 (AR33145); AR22880, 22889.

5

        j.        **Framework for modifying production capacity**. Action 10 established the procedure for making changes to the FMP/PEIS and Regulations. AR22544; 50 C.F.R. § 622.109 (AR33146).

14.      NMFS acknowledged in the FMP/PEIS that offshore aquaculture carries numerous direct and indirect impacts on the physical, economic, social, and administrative environments of the Gulf. *See* AR22788-22812. These impacts include: increased risks of diseases to wild fish; chemical and nutrient pollution from inputs of aquaculture (such as fish feed, antibiotics and pesticides) that negatively affect water quality and the marine environment; loss of genetic diversity and habitat of wild fish from the escape of farmed fish; loss of traditional fishing grounds; reduced market price for wild-caught fish from farmed fish competition; and other associated decline in employment and income to fishing and fishing-related industries. *See id.*

15.      The Gulf is home for numerous species, from dolphins and sharks, tuna and mackerel, shrimp and lobster, to baitfish such as menhaden, and including federally protected species (6 species of whales, 5 species of sea turtles, 2 fish species, and 2 coral species protected under the ESA, plus 28 species of marine mammals protected under the Marine Mammal Protection Act). AR22655-68. This abundance also feeds the local communities: commercial and recreational fishing, boat charters, marine-related tourism and water sports generate millions and billions of dollars yearly. AR22746, 22759-61; AR22764-65, 22909.

16.      NMFS acknowledged that bycatch, caused mostly by encounters and entanglements with aquaculture structures, is a serious concern. AR22801-05. The FMP/PEIS recognized that many of our nation's iconic marine species, including many threatened and endangered species, are at risk should aquaculture facilities be set up in Gulf waters. *See id.*

NMFS stated that "[a]ll five species of [federally protected] sea turtles risk entanglement," AR22802, and dolphins and sharks may be injured by aquaculture structures. AR22804; *id.* (sharks and dolphins may be attracted to aquaculture structures); AR22802 (incidents of dolphin drowning due to entanglement in net pens). Further, NMFS recognized that aquaculture operations can negatively affect essential fish habitats. *See* AR22569-70, 22597-98.

17. NMFS recognized that impacts from offshore aquaculture could harm the Gulf's ecosystems and communities. The FMP/PEIS acknowledged the potential damage to local marine environments and traditional fishing industries, which could be detrimental to the affected fishing communities. AR22819-22.

18. NMFS identified potential ways to minimize economic harms to fishing communities—for example, if aquaculturists farmed species that have no significant commercial or recreational value in wild fisheries, or if farmed fish were available during different seasons or sold through different channels than their wild counterparts—but did not adopt them. *See* AR22820.

19. The FMP/PEIS defers consideration of many environmental and socioeconomic impacts to the individual application phase, while NMFS made consideration of these impacts discretionary under the Regulations and required no additional NEPA analysis. 50 C.F.R. §§ 622.101(a)(2); 622.103(a)(4); 622.105(a); *See* AR 33119; AR33143.

20. Pursuant to the MSA, NMFS set both the annual maximum sustainable yield (MSY) and optimum yield (OY) for farmed fish to 64 million pounds, AR22624, while admitting the concepts of MSY and OY are inapplicable to aquaculture. *See* AR22623, 22866. NMFS set the OY equal to the MSY, claiming that no factors supported a reduction. AR22624.

21. On October 2, 2009, after NMFS finalized the FMP/PEIS, two of the Plaintiffs in this case, Gulf Restoration Network and Food & Water Watch, Inc., filed suit challenging the FMP/PEIS. *Gulf Restoration Network, Inc. v. NMFS*, 730 F. Supp. 2d 157 (D.D.C. 2010). The district court dismissed the case, finding that the claims were not ripe and the plaintiffs lacked standing since there was no final challengeable agency action until the issuance of implementing regulations. *Id.* at 174.

22. As early as 2009 NMFS acknowledged that its proposed action "may affect" multiple ESA-species—including several types of sea turtles (hawksbill, Kemp's ridley, leatherback, green, and loggerhead), marine mammals (blue whale, finback whale, humpback whale, sei whale, and sperm whale), the smalltooth sawfish, and corals (elkhorn and staghorn corals)—and initiated consultation. AR23115-16. NMFS did not undertake formal consultation, ending informal consultation with a 2-page memorandum concluding that adverse impacts to ESA species were "extremely unlikely." AR23118.

23. On April 20, 2010, an explosion occurred on the Deepwater Horizon oil platform in the Gulf of Mexico, causing the "biggest offshore oil spill in American history." *See* Campbell Robertson & Clifford Krauss, *BP May Be Fined Up to $18 Billion for Spill in Gulf*, N.Y. Times (Sept. 4, 2014), https://www.nytimes.com/2014/09/05/business/bp-negligent-in-2010-oil-spill-us-judge-rules.html.

24. Subsequently, on January 25, 2013, NMFS announced their intent to prepare a Supplemental Environmental Impact Statement (the SPEIS). AR26222-23. The SPEIS was limited to assessing the impacts of the oil spill. *See id.* NMFS also prepared a separate Supplemental Information Report (the SIR)—a non-NEPA document— to address the passage of time. *See* AR27454.

25.     In June 2015, NMFS finalized the SPEIS, concluding that the Deepwater Horizon blowout did not alter any of its conclusions in the FMP/PEIS. *See* AR26916. In 2016, NMFS also finalized the SIR, similarly affirming that no updates were necessary. AR33074.

26.     In 2015, NMFS again made a "not likely to adversely affect" decision when it "reinitiated" consultation due to changes to several Gulf ESA species since 2009, AR32684, AR32686, including the designation in 2014 of huge swaths of the Gulf of Mexico as critical habitat for loggerhead sea turtles. *See* Endangered and Threatened Species: Critical Habitat for the Northwest Atlantic Ocean Loggerhead Sea Turtle Distinct Population Segment (DPS) and Determination Regarding Critical Habitat for the North Pacific Ocean Loggerhead DPS, 79 Fed. Reg. 39,856 (July 10, 2014). In less than two weeks from reinitiation, NMFS again concluded they could forgo formal consultation. AR32688; FR_PR37500.

27.     NMFS did not prepare a Biological Assessment or Biological Opinion in 2009 or 2015, regarding the impacts of the proposed offshore aquaculture permitting scheme on listed species or their critical habitat. *See* 50 C.F.R. § 402.12.

28.     In February 2013, while the SPEIS and SIR were under development, NMFS moved forward with the final step to authorize offshore aquaculture. Instead of reviewing the draft regulations within the statutory 15 days upon Gulf Council submission in 2009, NFMS did not take any action until 2013, after the FMP/PEIS had gone into effect, when it sought the Council's approval of new draft regulations that NMFS unilaterally edited. *See* AR27443-63; AR22523, 23224; AR27172, 27220.

29.     In 2016, NMFS promulgated the Regulations authorizing commercial offshore aquaculture in the Gulf. *See* AR33107-46.

DATED: September 21, 2017            Respectfully submitted,

*/s/ Sylvia Shih-Yau Wu*
SYLVIA SHIH-YAU WU *(Pro Hac Vice)*
Center for Food Safety
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
T: (415) 826-2770 / F: (415) 826-0507
Email: swu@centerforfoodsafety.org

GEORGE A. KIMBRELL (*Pro Hac Vice*)
AMY L. VAN SAUN (*Pro Hac Vice*)
Center for Food Safety
917 SW Oak Street
Portland, OR 97205
T: (971) 271-7372 / F: (971) 271-7374
Emails: gkimbrell@centerforfoodsafety.org
            avansaun@centerforfoodsafety.org

MARIANNE CUFONE (LA Bar 34864)
540 Broadway Street, Room 340
New Orleans, LA 70118
T: (844) 732-3276 / F: (813) 774-6595
Email: mcufone@recirculatingfarms.org

EMILY POSNER (LA Bar 35284)
7214 Saint Charles Avenue, Box 913
New Orleans, LA 70118
T: (207) 930-5232 / F: (813) 774-6595
Email: eposner@recirculatingfarms.org

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

> */s/ Sylvia Shih-Yau Wu*
> SYLVIA SHIH-YAU WU *(Pro Hac Vice)*
> Center for Food Safety
> 303 Sacramento Street, 2nd Floor
> San Francisco, CA 94111
> T: (415) 826-2770 / F: (415) 826-0507
> Email: swu@centerforfoodsafety.org
>
> *Attorney for Plaintiffs*