UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GULF FISHERMENS
ASSOCIATION ET AL.                                      CIVIL ACTION

VERSUS                                                  NO: 16-1271

NATIONAL MARINE FISHERIES
SERVICE ET AL.                                          SECTION: "H"(1)

## ORDER AND REASONS

Before the Court are Cross Motions for Summary Judgment (Docs. 80, 82). For the following reasons, Plaintiffs' Motion is GRANTED, and Defendants' Motion is DENIED.

## BACKGROUND

This case is a challenge to administrative action by the National Marine Fisheries Service (NMFS), whereby it adopted a regulatory scheme for offshore aquaculture in the federal waters of the Gulf of Mexico Exclusive Economic

Zone.[1]  Plaintiffs include a bevy of special interests groups representing both food safety advocates and Gulf fishermen.[2] Plaintiffs challenge the aquaculture regulations as facially invalid because they fall outside NMFS's authority to regulate fisheries under the Magnuson-Stevens Fishery Conservation and Management Act (MSA).  They also challenge the propriety of the rulemaking process under which the regulations were enacted.  Plaintiffs aver that the Agency failed to properly consider a litany of environmental problems that will be presented by aquaculture in the Gulf of Mexico.

Plaintiffs seek declaratory and equitable relief declaring that Defendants violated the MSA, the Endangered Species Act (ESA), the National Environmental Policy Act (NEPA), and the Administrative Procedures Act (APA) when they enacted regulations regarding offshore aquaculture. Plaintiffs ask this Court to vacate the regulations as arbitrary and capricious agency actions and order Defendants to comply with theses statutes before proposing any new action regarding aquaculture in the Gulf of Mexico.

Plaintiffs and Defendants have filed Cross-Motions for Summary Judgment on all issues raised in this case.

---

[1] Defendants are National Marine Fisheries Service (NMFS); National Oceanic and Atmospheric Administration (NOAA); Eileen Sobeck, in his official capacity as Assistant Administrator for Fisheries; Dr. Roy Crabtree, in his official capacity as Regional Administrator for NMFS, Southeast Region; Kathryn Sullivan, in his official capacity as Undersecretary of Commerce for Oceans and Atmosphere and Administrator of NOAA; and Penny Pritzker in her official capacity as United States Secretary of Commerce.

[2] Plaintiffs are Gulf Fishermen's Association; Gulf Restoration Network; Destin Charter Boat Association; Alabama Charter Fishing Association; Fish For America USA, Inc.; Florida Wildlife Federation; Recirculating Farms Coalition; Food & Water Watch, Inc.; and Center for Food Safety.

## **LEGAL STANDARD**

Challenges to agency action brought under the MSA, NEPA, and ESA are subject to judicial review on specific grounds set forth in the APA.[3] The APA states, in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;[4]

The Fifth Circuit has mirrored this language, finding that courts should only overturn rules pursuant to the APA if agency action "is arbitrary, capricious, and abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole."[5]

The Court must also be mindful of the two-step process of judicial review of agency action outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[6] Pursuant to *Chevron*, a court reviewing an agency's construction

---

[3] 16 U.S.C. § 1855(f)(1).
[4] 5 U.S.C. § 706.
[5] Buffalo Marine Services, Inc. v. U.S., 663 F.3d 750, 753 (5th Cir. 2011) (citations omitted).
[6] 467 U.S. 837 (1984).

of a statute must first ask "whether Congress has directly spoken to the precise question at issue."[7] If Congressional intent is clear, "that is the end of the matter."[8] If, however, the statute is silent or ambiguous with regard to the specific issue, the question then becomes whether agency action is "based on a permissible construction of the statute."[9] "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."[10] Indeed, the Court cannot substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."[11]

## **STATUTORY FRAMEWORK**

Before addressing the merits of these motions, a brief background of the statutory scheme governing this dispute is helpful. The Magnuson-Stevens Act was passed by Congress in 1976 for the purpose of conserving and managing fishery resources nationwide.[12] To accomplish this goal, the MSA established eight Regional Fishery Management Councils, each tasked with preparing Fishery Management Plans ("FMPs") to address conservation and management of fisheries under their control.[13] The Councils are empowered to draft FMPs that are "necessary and appropriate for the conservation and

---

[7] *Id.* at 842.
[8] *Id.* at 843.
[9] *Id.* at 843–44.
[10] *Id.*
[11] *Id.* at 844.
[12] 16 U.S.C. § 1801(b)(1).
[13] *Id.* at § 1852(h)(1).

management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery."[14] The Gulf Council is one such regional council, with authority to manage fisheries in the federal waters of the Gulf of Mexico off the coasts of Texas, Louisiana, Mississippi, Alabama, and Florida.

The Act requires the Councils to form their FMPs through a process of notice-and-comment rulemaking. FMPs and proposed regulations to implement the FMP are proposed by the Regional Councils, with final regulations promulgated by the Secretary of Commerce through the NMFS.[15] The Secretary and the NMFS have limited discretion in choosing to adopt or reject FMPs approved by the Regional Councils; however, the decisions of the Councils are without regulatory effect until the NMFS acts.[16] Once the Secretary, through the NMFS, reviews the plans and publishes the final regulations in the Federal Register, they have the full force of law.[17]

## LAW AND ANALYSIS

On January 13, 2016, Defendant NMFS, with the help of the Gulf Council, finalized regulations authorizing a commercial aquaculture permitting scheme in federal waters ("the Regulations"). This action was analyzed in an FMP and programmatic Environmental Impact Statement ("PEIS"), treating all farmed fish as a fishery unit under the MSA. The Regulations establish a permitting

---

[14] *Id.* at § 1853(a)(1)(A).
[15] *See* Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 111 (1st Cir. 2002). The NMFS is a division of the National Oceanic and Atmospheric Administration ("NOAA"), which is in turn a division of the Department of Commerce.
[16] 16 U.S.C. § 1854.
[17] *Id.*

scheme for conducting commercial aquaculture in the Gulf of Mexico. The scheme creates an application process for the permitting of aquaculture facilities and establishes regulations for the management of these facilities.

Plaintiffs complain that the adoption of the Regulations was outside of the authority of the NMFS. Plaintiffs also argue that the NMFS's actions violate the standards of the MSA, NEPA, and ESA because the Regulations allow a permit holder to farm fish in most areas of the Gulf with little oversight and defer consideration of the environmental and socioeconomic impacts of aquaculture on a discretionary and individual applicant basis. Because this Court ultimately finds that the NMFS was without authority under the MSA to promulgate the Regulations, it need not address Plaintiffs' other arguments.

### A. The MSA Does Not Authorize the Regulation of Aquaculture

Plaintiffs argue that, pursuant to Section 705(2)(C) of the APA, the NMFS exceeded its statutory authority in implementing aquaculture regulations. Specifically, they argue that the Regulations are ultra vires because the MSA grants the NMFS the authority to regulate only fishing, and aquaculture is not fishing. The NMFS interprets the MSA to include the authority to regulate aquaculture. This Court must consider these arguments under a *Chevron* analysis, asking first "whether Congress has directly spoken to the precise question at issue" and second whether the NMFS's interpretation is arbitrary or capricious. [18]

The MSA grants the NMFS "broad authority to issue any regulation deemed 'necessary' to effectuate the underlying purposes of the statute."[19] The

---

[18] *Chevron*, 467 U.S. at 842.
[19] Alfa Int'l Seafood v. Ross, 264 F. Supp. 3d 23, 49 (D.D.C. 2017).

NMFS bases its authority to promulgate the aquaculture regulations on the MSA's definition of "fishing." The MSA defines "fishing" as:

> (A) the catching, taking, or harvesting of fish;
> (B) the attempted catching, taking, or harvesting of fish;
> (C) any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish; or
> (D) any operations at sea in support of, or in preparation for, any activity described in subparagraphs (A) through (C).[20]

The NMFS contends that the term "harvesting" gives it the authority to regulate aquaculture. It has interpreted "harvesting" to mean the "act or process of gathering a crop," in this case a crop of fish. Defendants argue that because the MSA does not directly address the precise question at issue and nothing in the MSA prohibits its promulgation of these regulations, then the Step 1 analysis ends. Courts, however, have expressly rejected such an argument. "'To suggest, as the [agency] effectively does, that *Chevron* step two is implicated at any time a statute does not expressly negate the existence of a claimed administrative power . . . is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent.'"[21]

Rather, in addressing *Chevron* Step 1, the Court must look to determine Congress's intent. "[I]f Congress's intent can be ascertained from the plain language of the statute, then that intent must be given effect."[22] Courts have held that Congress must have explicitly or implicitly delegated authority to an agency before it can receive deference under *Chevron* Step 2.[23] "'The power of

---

[20] 16 U.S.C. § 1802.
[21] Texas v. United States, 809 F.3d 134, 186 (5th Cir. 2015), as revised (Nov. 25, 2015) (quoting Ethyl Corp. v. EPA, 51 F.3d 1053, 1060 (D.C.Cir.1995)).
[22] *Ethyl Corp*, 51 F.3d at 1058.
[23] *Id.*

an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'"[24] "Although *Chevron* step one analysis begins with the statute's text, the court must examine the meaning of certain words or phrases in context and also exhaust the traditional tools of statutory construction, including examining the statute's legislative history to shed new light on congressional intent, notwithstanding statutory language that appears superficially clear."[25] Where traditional canons of statutory construction resolve ambiguity, "*Chevron* leaves the stage."[26]

Plaintiffs contend that Congress did not contemplate that the term "harvesting" would include the farming of fish and that the more logical reading is that "harvesting," read in conjunction with the neighboring terms "catching" and "taking," refers to the catching of wild fish. NMFS relies on dictionary definitions of "harvesting"—"the act or process of gathering a crop"—and "crop"—"the yield of some other farm produce"—to support its interpretation. The canon *noscitur a sociis* instructs "that when a statute contains a list, each word in that list presumptively has a 'similar' meaning" or gathers meaning from the words around it.[27] The maxim, "while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of

---

[24] Texas v. United States, 497 F.3d 491, 513 (5th Cir. 2007) (quoting Morton v. Ruiz, 415 U.S. 199, 231–32 (1974)).
[25] Sierra Club v. E.P.A., 551 F.3d 1019, 1027 (D.C. Cir. 2008) (internal quotations omitted).
[26] Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1630 (2018).
[27] Yates v. United States, 135 S. Ct. 1074, 1089 (2015).

Congress."[28] Here, the terms "catching" and "taking" more appropriately describe traditional fishing activities and would be awkward in reference to the farming of fish. Therefore, the maxim suggests that harvesting should be read similarly to refer only to the traditional fishing of wild fish. Even so, "[s]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[29] Accordingly, this Court next considers both the statutory scheme and legislative history of the MSA.

In reviewing the statutory scheme, the Court looks first to the MSA's findings and purpose statement, which outlines the MSA's purpose to, among other things, "conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles."[30] The MSA's findings and purpose discuss the fish "found" off the coast of the United States and the "species which dwell" off the coasts of the United States as natural resources.[31] Nowhere in the MSA's findings and purpose does Congress mention aquaculture or the management of fish as crops. In fact, "aquaculture" or the farming of fish is only mentioned in three discrete and

---

[28] Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307 (1961).
[29] Chamber of Commerce of United States of Am. v. United States Dep't of Labor, 885 F.3d 360, 372 (5th Cir. 2018), judgment entered sub nom. Chamber of Commerce of Am. v. United States Dep't of Labor, No. 17-10238, 2018 WL 3301737 (5th Cir. June 21, 2018) (internal quotation omitted).
[30] 16 U.S.C. § 1801.
[31] *Id.* § 1801(a)(1), (b)(1).

9

immaterial provisions of the MSA.[32] These brief references make clear that Congress was aware of aquaculture when it enacted the MSA, yet did not explicitly include the management of aquaculture within the NMFS's authority.

Further, Plaintiffs point out various ways in which the MSA as a whole is nonsensical when applied to aquaculture. First, the MSA requires that all FMPs "contain the conservation and management measures, applicable to foreign fishing and fishing by vessels" and allows an FMP to issue permits for fishing to "any fishing vessel" or "the operator of any such vessel."[33] The MSA defines a "fishing vessel" as "any vessel, boat, ship, or other craft" and this term would not encompass a stationary aquaculture facility, such as a cage or pen.[34] An FMP is also required to contain measures necessary to prevent overfishing—a term that is inapplicable to the concept of fish farming. The MSA further requires an FMP to assess the maximum sustainable yield and optimum yield from a fishery—yet another concept that is nonsensical in the regulation of aquaculture. Indeed, the NMFS addressed this conceptual incompatibility in the PEIS, stating:

---

[32] *See id.* § 1852(b)(2)(D)(iii) (stating that "an individual who owns or operates a fish farm outside of the United States shall not be considered to be a representative of the commercial or recreational fishing sector" for purposes "appointment by the Secretary of Commerce to the Gulf of Mexico Fisheries Management Council"); *id.* § 1855(j)(2) (stating that "The Secretary shall establish a pilot program for regionally-based marine education and training programs in the Western Pacific and the Northern Pacific" to include education regarding responsible aquaculture"); *id.* § 1863 (discussing the award of "contracts, grants and other financial assistance to United States citizens to carry out the purpose" of, among other things, "helping to restore overfished New England groundfish stocks through aquaculture or hatchery programs.").
[33] 16 U.S.C. § 1853.
[34] *Id.* § 1802 (18).

> The [MSA] was written in part to establish the legal framework for managing wild fisheries resources of the United States, and not explicitly written for managing at sea fish farming or aquaculture operations. Many of the principles and concepts that guide wild stock management under the [MSA] are either of little utility or not generally applicable to the management of aquaculture operations. Despite this lack of conceptual similarity, offshore aquaculture falls within the realm of activities subject to regulatory control under the [MSA] and therefore must be accommodated within the existing legal framework. Many [MSA] legal requirements do not fit well or are difficult to satisfy with respect to aquaculture, thereby making them seem less useful or even unnecessary. This is particularly true for yield targets and stock status parameters around which management of wild fisheries is based. Regardless, there are legal requirements, and until additional legal authority specifically suited for management of open ocean aquaculture is established, all such requirements must be satisfied.[35]

Contrary to the NMFS's position, this Court does not view the incompatibility of the requirements of the MSA with aquaculture operations as an unfortunate happenstance, but rather, as a clear indication that Congress did not intend for the MSA to grant NMFS the authority to regulate aquaculture.

The legislative history underscores this point. Plaintiffs demonstrate that throughout the legislative history of the MSA, the word "harvesting" is repeatedly used in regards to traditional fishing of wild fish.[36] "A fundamental

---

[35] AR 22866.

[36] *See, e.g.*, Staff of S. Comm. on Commerce, 94th Cong., Memorandum to the Foreign Relations Committee from the Committee on Commerce (Comm. Print 1975), *reprinted in* A LEGIS. HISTORY OF THE FISHERY CONSERVATION AND MANAGEMENT ACT OF 1976, at 624 (1976) ("The volume of fish harvested off the U.S. coast has increased dramatically from approximately 4.4 billion pounds in 1948 to 11.6 billion pounds in 1973. . . . Nearly the entire growth in U.S. fish consumption has been supplied by imports that are often harvested in U.S. coastal waters by foreign fishing fleets, processed in the home port of the foreign fishing

canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."[37] Defendants do not rebut this point, but instead, point to the National Aquaculture Act (NAA), enacted in the midst of amendments to the MSA, as an indication that Congress was both aware of and supportive of aquaculture. They also cite to a proposed bill attempting to create aquaculture regulations and argue that it "implicitly recognized" that aquaculture falls under the authority of the MSA.[38] While the NAA and the proposed bill may evince a national policy of promoting aquaculture, they do not indicate that Congress intended the MSA to give the NMFS authority to regulate it. And they certainly do not create an ambiguity as to the intent of the drafters of the MSA. "[E]ven when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned

---

vessel, and exported for sale to the United States. . . . As a result of virtually unrestrained harvesting of U.S. coastal fishery resources, particularly by large-scale foreign fishing fleet operations, at least 14 fish species of interest to U.S. fishermen have been overfished."); Staff of S. Comm. on Commerce, 94th Cong., Report of the Committee on Commerce to accompany S. 961 (Comm. Print 1975), *reprinted in* A LEGIS. HISTORY OF THE FISHERY CONSERVATION AND MANAGEMENT ACT OF 1976, at 667 ("World fleets now harvest, according to the most reliable figures, 70 million metric tons of fish."); 122 Cong. Rec. at 260 ("[T]he need for this legislation grows as the reckless harvesting of our valuable fishery resources continues unabated off our Nation's coastline."); Doc. 80-2, p. 26–27 and passages quoted therein.

[37] Perrin v. United States, 444 U.S. 37, 42 (1979).

[38] National Offshore Aquaculture Act of 2007, S. 1609 (110th Cong., 1st Session) (suggesting a provision stating that, "Notwithstanding the definition of the term "fishing" in section 3(16) of the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1802(16)), the conduct of offshore aquaculture in accordance with permits issued under this Act shall not be considered "fishing" for purposes of that Act. The Secretary shall ensure, to the extent practicable, that offshore aquaculture does not interfere with conservation and management measures promulgated under the Magnuson-Stevens Fishery Conservation and Management Act.").

from its language and legislative history prior to its enactment."[39] Indeed, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."[40] "The legislative history of a statute is the history of its consideration and enactment."[41] Here, that history shows an intent to read "harvesting" as the catching of wild fish.

Finally, this Court finds Defendants' reliance on the reasoning of the court in *Kahea v. NMFS* unavailing.[42] In *Kahea*, the plaintiffs sought to invalidate a one-year fishing permit issued by the NMFS to Kona Blue Water Farms, Inc. ("Kona Blue") to "stock, culture and harvest" almaco jack fish in a mesh cage that was continuously towed behind a vessel.[43] The fish were cultured in a land-based hatchery and then grown within the towed, mesh cage.[44] Plaintiffs argued that the NMFS lacked the authority to issue the permit under the MSA because Kona Blue was engaged in aquaculture.[45] The District Court of Hawaii held that the NMFS's interpretation of "harvesting" to include the Kona Blue project was reasonable.[46] In so holding, the court gave short shrift to step one of *Chevron*.[47] Even so, the issue before the court—a

---

[39] Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 (1980).
[40] *Id.* at 117.
[41] Sullivan v. Finkelstein, 496 U.S. 617 (1990) (J. Scalia, concurring).
[42] KAHEA v. Nat'l Marine Fisheries Serv., No. 11-00474 SOM, 2012 WL 1537442 (D. Haw. Apr. 27, 2012), aff'd in part, rev'd in part and remanded sub nom. Kahea, Food & Water Watch, Inc. v. Nat'l Marine Fisheries Serv., 544 F. App'x 675 (9th Cir. 2013).
[43] *Id.* at *1.
[44] *Id.* at *2.
[45] *Id.*
[46] *Id.* at *9.
[47] *Id.* ("Defendants' interpretation of the word 'harvesting' was not irrational or contrary to plain meaning. The MSA does not define 'harvesting,' nor is there a regulation defining the term. The court is unaware of any legislative history discussing the definition of 'fishing' or the meaning of 'harvesting' in the MSA.").

single permit for a non-stationary vessel—is easily distinguished from the issue before this Court—an entirely new regulatory scheme permitting aquaculture facilities throughout the Gulf. Further, the court in *Kahea* expressly held that the permit issued to Kona Blue "did not create a rule that aquaculture is 'fishing.'"[48] Accordingly, the court's reasoning in *Kahea* is not binding, applicable, or persuasive.

In analyzing the plain text, statutory scheme, and legislative history of the MSA, this Court finds that the term "harvesting" was intended to refer to the traditional fishing of wild fish. There is nothing in the MSA or its legislative history to suggest that Congress might have intended that the term be defined to include the farming of fish. Ambiguity "is a creature not of definitional possibilities but of statutory context."[49] There is no ambiguity in the term "harvesting" such that the NMFS was authorized to fill a gap therein. The NMFS's interpretation of "harvesting" relies "too narrowly on a purely semantic construction of one isolated provision and wrongly presupposes that the provision is inherently ambiguous."[50]

It is often said that "Congress does not 'hide elephants in mouseholes,'" and this Court cannot imagine a more fitting example.[51] Had Congress intended to give the NMFS the authority to create an entirely new regulatory permitting scheme for aquaculture operations, it would have said more than "harvesting." The MSA is a conservation statute, aimed at the conservation

---

[48] *Id.* at *11.
[49] Chamber of Commerce of United States of Am. v. United States Dep't of Labor, 885 F.3d 360, 369 (5th Cir. 2018), judgment entered sub nom. Chamber of Commerce of Am. v. United States Dep't of Labor, No. 17-10238, 2018 WL 3301737 (5th Cir. June 21, 2018).
[50] *Id.*
[51] *Id.* at 376.

14

and management of natural resources. Fish farmed in aquaculture are neither "found" off the coasts of the United States nor are they "natural resources." The NMFS acted outside of its statutory authority in shoehorning an entire regulatory scheme into a single unambiguous word. Because this Court is obligated under the APA to "hold unlawful and set aside agency action, findings, and conclusions . . . in excess of statutory . . . authority," the Regulations are vacated.[52]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion is GRANTED, and Defendants' Motion is DENIED. Plaintiffs are entitled to the entry of judgment in their favor. Plaintiffs shall file a proposed judgment in light of this opinion within 10 days.

New Orleans, Louisiana this 24th day of September, 2018.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[52] 5 U.S.C. § 706(2)(C).